IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAUL MILLER, ) | |
|     Plaintiff, ) | |
| ) | |
| vs ) | Civil Action No. 05-70 |
| ) | |
| C&K INDUSTRIAL SERVICES, INC., ) | |
|     Defendant. ) | |

REPORT AND RECOMMENDATION

I. Recommendation:

It is respectfully recommended that the defendant's motion for summary judgment (Docket No. 14) be denied as to Count I of the complaint and granted as to Count II.

II. Report:

Presently before the Court is a motion for summary judgment submitted by the defendant, C&K Industrial Services, Inc. ("C&K").

The plaintiff, Paul Miller, commenced this action in the Court of Common Pleas of Washington County, PA, complaining that C&K breached the parties' employment agreement by wrongfully terminating his employment and violated the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 Pa.C.S.A. § 260.1, et seq., by refusing to pay him compensation and benefits which he is owed. C&K filed a timely notice of removal to this Court, and it is not disputed that the Court has original jurisdiction of this matter pursuant to 28 U.S.C. §1332.[1]

Relevant facts to which there is no dispute are these: in November 1997, C&K

---

[1]. The plaintiff is a resident of Mather, Pennsylvania. The defendant is a foreign corporation with its principal place of business in Independence, Ohio; and the amount in controversy exceeds the statutory limit.

hired the plaintiff as a mechanic to work at its former location in Moon Township, PA.  The plaintiff was subsequently promoted to the position of maintenance manager by C&K.  Effective October 12, 2004, the plaintiff and C&K entered into a written Employment Agreement, which provided that the plaintiff would be employed at C&K's Burgettstown, PA location as a maintenance manager for a two-year term, with an annual salary of $55,900, plus a company vehicle or vehicle allowance, vacation, retirement and pension benefits, and sick pay allowance.

On December 14, 2004, the plaintiff was informed by C&K's General Manager that a female employee at C&K had made allegations of sexual harassment against him, and as a result, it was suspending him from his employment effective immediately.  The plaintiff was instructed to leave the premises that day, and he was not allowed to retain his personal property.  On December 15, 2004, C&K terminated the plaintiff's employment and directed him not to return to its Burgettstown location.

The plaintiff contends that the allegations of sexual harassment attributed to him were unfair, unfounded and without merit.  According to the plaintiff, C&K terminated his employment without cause in violation of the parties' Employment Agreement, and it failed to conduct an adequate investigation into the facts.  The plaintiff avers that following his discharge, C&K refused to pay him both his past due and prospective salary and benefits and denied him access to his personal property.  In his two-count complaint, the plaintiff asserts claims for breach of the Employment Agreement/conversion of property (Count I) and violation of the WPCL (Count II).

C&K has moved for summary judgment.  It argues that it terminated the plaintiff's employment for cause pursuant to the terms of the Employment Agreement, such that the

plaintiff's claim for breach of contract lacks merit. It also argues that the plaintiff's claim under the WPCL fails, since the Employment Agreement is to be construed under Ohio law.

Summary judgment is appropriate if no genuine issue of material fact is in dispute, and the movant is entitled to judgment as a matter of law. F.R.Civ.P. 56(c); Biener v. Calio, 361 F.3d 206, 210 (3d Cir. 2004). For reasons discussed below, C&K's motion for summary judgment should be granted in part and denied in part.

In resolving the parties' dispute, we focus on two provisions of their Employment Agreement. Section 5.1 of the Employment Agreement permits C&K to terminate the Agreement "at any time with cause". Section 6.5 of the Agreement contains a choice of law provision, specifying that the Agreement shall be governed by Ohio law.

Specifically, Section 5.1 of the Agreement provides:

> The Employer shall have the right and power to terminate this Agreement at any time with cause. Termination shall be effected by giving notice to the employee without prejudice to any other remedy at law, in equity, or under this Agreement. "With cause", as used herein, shall be deemed to mean actions or inactions by the Employee which are contrary to Employee's obligations set forth herein, contrary to standards established or upheld by Employer, which are detrimental to Employer's best interests, or which are immoral or illegal.

Section 6.5 provides: This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio.

With respect to the parties' choice of law provision in Section 6.5 of the Agreement, we note that in cases as here, where jurisdiction is based upon diversity, a federal court sitting in Pennsylvania should apply the choice of law rules of the forum state. Kruzits v. Okuma Machine Tool, Inc., 40 F.3d 52, 55 (3d Cir. 1994). Under the law of Pennsylvania,

"courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." Id.

In Kruvits, the Court stated:

Pennsylvania courts have adopted section 187 of the Restatement, Second, Conflict of laws which provides that:

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

Id. Here, the parties could have inserted a provision in the Employment Agreement giving the plaintiff the right to bring a claim under the laws of Pennsylvania, but they chose not to do so. Thus, the Employment Agreement will be construed under Ohio law.

With respect to the termination provision of the Employment Agreement, Section 5.1 specifies that C&K "shall have the right and power to terminate this Agreement at any time with cause." In relevant part, "with cause" is deemed to mean "actions or inactions by the Employee which are ... contrary to standards established or upheld by [C&K, or] which are detrimental to [its] best interests".

C&K avers that one of the "standards" which it established or upheld was an anti-harassment policy which it circulated on or about August 3, 2003. The record shows that C&K's General Manager, Jim Chaousis, sent a memo to all employees dated August 3, 2003 which apprised them as follows:

[I]n May of [2003], I became aware of some [harassing] comments that had been made by one C&K employee to another C&K employee... At that time I warned all involved that this is not going to be tolerated. Since then I have

4

> heard that some employees may not have received my
> message and it may still be happening... You may note
> that there are many forms of harassment. If you think that
> disguising it as a joke makes it acceptable, this should
> show you otherwise... I urge you to bring any types of
> harassment to my attention... C&K or myself will not
> tolerate <u>any forms of harassment.</u> If I hear of any I am
> prepared to proceed with <u>disciplinary action to include</u>
> <u>termination</u>[.] [T]his is your warning! [emphasis in original].[2]

The above memo, together with C&K's policy on harassment, was distributed to C&K personnel. C&K's policy on harassment provides in pertinent part:

> ... Harassment of any sort – verbal, physical, visual –
> will not be tolerated. Specifically, no employee shall
> harass another employee, either explicitly, or implicitly...
> Harassment can take many forms. It may be, but is not
> limited to: words, signs, jokes, pranks, intimidation,
> physical contact, or violence... Sexual harassment may
> include unwelcome sexual advances, requests for sexual
> favors, other verbal or physical contact of a sexual nature
> when such conduct creates an intimidating environment,
> [or] prevents an individual from effectively performing the
> duties of their position... Any employee found to have
> harassed a fellow employee or subordinate will be subject
> to severe disciplinary action or possible discharge. C&K
> will also take any additional action necessary to appropriately
> correct the situation.[3]

The plaintiff admits that he read and understood C&K's policy on harassment, and a copy of the policy is signed in his handwriting.[4]

On the walls of his office at work, the plaintiff had approximately 30 pictures of his wife wearing adult-oriented outfits; the outfits displayed in the pictures were items of

---

2. See, Exhibit C to the defendant's brief in support of its present motion.

3. Id.

4. See, deposition of Paul Miller at pp. 17-20 (at Exhibit A to the defendant's brief).

clothing which the plaintiff's wife sold in her on-line store, Autumn's Boutique.[5]  When a female applicant, Julie Miller, was set to interview for a job at C&K, Jim Chaousis, the defendant's General Manager, asked the plaintiff to remove the pictures of his wife, as Chaousis believed they could make the applicant feel uncomfortable.[6]  The plaintiff avers that he removed all but three pictures of his wife when he interviewed Julie Miller.[7]

In August 2004, Julie Miller interviewed for a position at C&K and met with the plaintiff for about 5 ½ hours, during which time she spent 1 ½ hours in his office.[8]  Julie Miller recalls that the plaintiff had approximately 20 pictures of a woman wearing skimpy outfits on his office wall, some of which revealed portions of the woman's breasts; Miller later learned the pictures were of the plaintiff's wife.[9]  Julie Miller avers that the pictures made her feel a little uneasy, and she thought it was inappropriate to display them in an office.[10]  After C&K hired Julie Miller, the pictures of the plaintiff's wife were removed, and the plaintiff became her direct supervisor.[11]

While on the job, Julie Miller learned that the plaintiff's wife operated a website which sold clothing and lingerie, as she heard the plaintiff talk about it with other employees and

---

5.   Id. at pp. 30-31.

6.   Id. at pp. 31-32.

7.   Id. at p. 33.

8.   See, deposition of Julie Miller at p. 7 (at Exhibit F to the defendant's brief).

9.   Id. at pp. 8-9.

10.  Id. at p. 9.

11.  Id. at pp. 9, 12.

mention that women modeled the lingerie on the website.[12]  According to the plaintiff, everyone at C&K was familiar with his wife's store.[13]

Julie Miller avers that on November 24, 2004, the plaintiff approached her at work and asked "What size are you?  I may have to borrow your body."[14]  Julie Miller assumed the plaintiff wanted to know her size so he could buy a gift for someone, so Miller told him her size, after which the plaintiff asked her how she would feel about modeling for a catalog.[15]  The plaintiff asserts he told Julie Miller that his wife was trying to put together a catalog for Christmas, and if Miller needed extra money, she could model jackets, pants and dresses, for which his wife would pay $20 an hour.[16]  The plaintiff was under the impression that Julie Miller needed extra money because her car frequently broke down, and she took things from work that were otherwise going to be thrown away.[17]

In response to the plaintiff's query, Julie Miller asked the plaintiff if she had to show her legs, as her legs were not great looking, and the plaintiff replied that his wife had pants to be modeled.[18]  The plaintiff never informed Julie Miller that his wife maintained an on-line clothing business, or that his modeling suggestion pertained to it; rather, the plaintiff told Miller

---

12.   Id. at pp. 12-13.

13.   See, plaintiff's deposition at p. 51.

14.   See, deposition of Julie Miller at p. 22.

15.   Id. at pp. 22, 24.

16.   See, plaintiff's deposition at pp. 43-44.

17.   Id. at p. 70.

18.   Id. at p. 49.

that the modeling would involve jackets, pants and dresses for a catalog only.[19]

Julie Miller asserts that after her aforesaid conversation with the plaintiff, she felt a "little weird", "uncomfortable, shocked".[20] Since the plaintiff was her supervisor, Miller began wondering if he hired her as a potential model, and she felt embarrassed and upset.[21] Julie Miller's co-worker, Jeffrey Clark, described her as a "nervous wreck" after the incident.[22] However, no evidence shows that Julie Miller was unable to perform any of her work duties following her conversation with the plaintiff.

The plaintiff admits that his wife did not ask him to find models for her clothing business.[23] Indeed, the plaintiff's wife was not seeking models, and she never paid anyone to model clothing for her business.[24] As it turns out, the catalog for which the plaintiff spoke to Julie Miller about modeling never materialized beyond the research stage.[25]

Julie Miller spoke to a co-worker about the plaintiff's comments, but having been employed at C&K for less than three months, she was hesitant to apprise General Manager Jim Chaousis about his comments for fear of losing her job.[26] Eventually, Jim Chaousis was

---

19.  Id. at p. 44.

20.  See, deposition of Julie Miller at p. 23.

21.  Id. at pp. 24-25.

22.  See, deposition of Jeffrey Clark at pp. 15-16 (at Exhibit H to the defendant's brief).

23.  See, plaintiff's answer to interrogatory No. 6 (at Exhibit I to the defendant's brief).

24.  See, deposition of Rachel Miller at pp. 15, 18, 23 (at Exhibit E to the defendant's brief).

25.  Id. at pp. 21-22.

26.  See, deposition of Julie Miller at pp. 25-26.

informed of the incident, and he set up a meeting with the plaintiff. Chaousis told the plaintiff of Julie Miller's allegations, and the plaintiff admitted that he asked Miller what size she wore, and informed her that his wife would pay her $20 an hour to model clothing for a catalog.[27]

At that juncture, C&K suspended the plaintiff. A day or two later, on December 15, 2004, Jim Chaousis called the plaintiff and told him that two of his co-workers, Jeffrey Clark and Ralph Van Camp, had verified Julie Miller's allegations.[28] As a result, Chaousis told the plaintiff "you know what I have to do", and he terminated the plaintiff's employment.[29] In response, the plaintiff informed Chaousis that he did not believe his actions constituted an infraction of C&K's policies or amounted to harassment.[30]

The plaintiff concedes that C&K paid him all of the salary he was owed up to the date of his termination.[31] Although he believes he should be compensated for five days of unused vacation time, the plaintiff admits that under the Employment Agreement, unused vacation days do not accrue, such that if he did not use his vacation time, he would lose it.[32] On January 8, 2005, the plaintiff acknowledged receiving items of his personal property from C&K.[33] According to C&K, the plaintiff received all of his personal property from its workplace

---

27. See, plaintiff's deposition at pp. 41-44.
28. Id. at p. 55.
29. Id. at pp. 55, 61.
30. Id. at pp. 55, 71-72.
31. Id. at p. 63.
32. Id. at pp. 60-62.
33. See, Exhibit N to the defendant's brief.

except for a light valued at $20 which it has been unable to locate.

In support of summary judgment on the plaintiff's breach of contract claim, C&K argues that it reasonably and in good faith construed the plaintiff's conduct as detrimental to its best interests, such that his termination complied with its Employment Agreement. As noted above, Section 5.1 of the Employment Agreement unambiguously specifies that C&K "shall have the right and power to terminate the Agreement at any time with cause." Under the Agreement, "with cause" means "actions or inactions by the Employee which are ... contrary to standards established or upheld by [C&K, or] which are detrimental to [its] best interests."

C&K asserts that after it circulated a zero-tolerance anti-harassment policy to its employees (which the plaintiff signed), the plaintiff asked his only female subordinate what size she wore, and whether she was interested in modeling clothing for a catalog presumably associated with his wife's adult-oriented clothing business. C&K asserts that the plaintiff's proposition to Julie Miller to model clothing was harassment, as the plaintiff admits that everyone at C&K was familiar with his wife's on-line clothing business, his wife did not ask him to locate models for her business, and the catalog for which he asked Julie Miller to model clothing never advanced beyond the research stage. Since the plaintiff admitted his actions and did not believe them to be an infraction of its harassment policy, C&K insists that it reasonably construed his actions as detrimental to its best interests.

Under Ohio law, "an employee may not be terminated under the just cause provision of an employment contract unless he engages in an affirmative act of misconduct." Young v. American Diabetes Ass'n., 30 Fed.Appx. 360, 364 (6th Cir. 2002), citing Zimmerman v. Eagle Mtge. Corp., 675 N.E.2d 480, 487 (Ohio App.2d Dist. 1996). "In determining just

cause, the established rule is that the employer may discharge for misconduct whose necessary tendency is to the injury of his business." <u>Zimmerman</u>, 675 N.E.2d at 487. In other words, "[t]he acts of the employee must be akin to conduct that necessarily injures the place of employment." <u>Young</u>, <u>supra</u>, 30 Fed.Appx. at 364.

Here, C&K has not presented evidence showing that the plaintiff's November 24, 2004 conversation with Julie Miller injured its business. As discussed above, Ms. Miller was able to perform all of her job duties following the incident, and the plaintiff insists she remained friendly toward him and behaved as she always did.

The plaintiff also argues that his actions did not violate C&K's harassment policy. As recited above, C&K's policy on harassment provides in relevant part:

> ... Harassment of any sort – verbal, physical, visual – will not be tolerated... Sexual harassment may include unwelcome sexual advances, requests for sexual favors, other verbal or physical contact of a sexual nature when such conduct creates an intimidating environment, [or] prevents an individual from effectively performing the duties of their position...

The plaintiff correctly asserts that he is not alleged to have made any unwelcome sexual advances, nor requested sexual favors from Julie Miller. Although he asked Ms. Miller her size and if she would be interested in modeling dresses, pants and jackets for a catalog, the record fails to show that the plaintiff's query created an intimidating environment or prevented Julie Miller from effectively performing her job duties.

C&K argues it is entitled to summary judgment because it reasonably and in good faith construed the plaintiff's conduct as detrimental to its best interests. Under Ohio law, "the relevant inquiry in determining the propriety of a 'just cause' termination is whether the

employer engaged in a good faith fact-finding investigation and whether the decision was founded upon substantial evidence." Chrvala v. Borden, Inc., 14 F.Supp.2d 1013, 1017 (S.D. Ohio 1998).

According to the plaintiff, C&K's investigation into the matter was minimal, as it failed to investigate whether his brief conversation with Julie Miller created an intimidating work environment or prevented Miller from effectively performing her job.  The plaintiff avers that C&K's investigation consisted entirely of Jim Chaousis' interviews with him, Julie Miller, and two other employees (Jeffrey Clark and Ralph Van Camp), and that C&K obtained written statements from witnesses only after he was terminated, and it never took his written statement. C&K's President, Arthur Karas, made the decision to terminate the plaintiff's employment after speaking to Jim Chaousis about the incident.  Karas never spoke to the plaintiff directly about his conversation with Julie Miller, even though Karas acknowledged that the plaintiff denied making certain statements to Miller when he was interviewed by Jim Chaousis.[34]

"The appropriate standard for determining whether an employer's decision to discharge an employee for 'just cause' is whether the employer had reasonable grounds for believing that the alleged misconduct occurred, and whether the decision was made in good faith and on the basis of substantial evidence." Chrvala, supra, 14 F.Supp.2d at 1017.  Based on the facts recited above, a trier of fact could reasonably find that the plaintiff's conversation with Julie Miller on November 24, 2004 did not constitute cause for termination under the Employment Agreement.  Thus, C&K's motion for summary judgment on Count I should be denied.

With respect to Count II of the complaint, it appears that C&K is entitled to

---

34.    See, deposition of Arthur Karas at pp. 15, 19, 20 (at Exhibit K to defendant's brief).

summary judgment on the plaintiff's claim under the WPCL, since the Employment Agreement is "governed by and construed in accordance with the laws of the State of Ohio". Under Pennsylvania law, where an employment agreement contains a choice-of-law provision that is governed by the laws of a forum <u>other than Pennsylvania</u>, the WPCL does not apply, even if the claimant is a resident of Pennsylvania. See, <u>Tucci v. CP Kelco APS</u>, 2002 WL 31261054, *2-*3 (E.D.Pa., Oct. 10, 2002). Conversely, if an employment contract is governed by Pennsylvania law, a claimant may assert a claim under the WPCL even if he is not a resident of Pennsylvania. <u>Synesiou v. DesignToMarket, Inc.</u>, 2002 WL 501494, *2-*3 (E.D.Pa. April 3, 2002); <u>Crites v. Hoogovens Tech. Services Inc.</u>, 43 Pa. D.&C. 4th 449 (Pa.Com.Pl. 2000). Here, since the Employment Agreement is governed by Ohio law, the plaintiff's claim under the WPCL cannot lie.[35]

Therefore, it is recommended that the defendant's motion for summary judgment be denied as to Count I of the complaint and granted as to Count II.

Within ten (10) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall

---

35. We note that even if the plaintiff's claim for payment of unused vacation time under the WPCL was tenable, it would fail under terms of the Employment Agreement. Exhibit A to the Agreement entitled "Compensation" provides in pertinent part: "Vacation pay is not accrued, nor can it be accumulated, therefore an Employee must take the vacation when eligible to receive compensation." As the plaintiff acknowledged in his deposition (at pp. 60-62), under terms of the Employment Agreement, if he did not use his vacation time, he would lose it. In addition, Section 5.2 of the Employment Agreement provides: "Should this Agreement be terminated by [C&K] prior to the expiration of the term of employment specified in this Agreement, the Employee shall be entitled only to the compensation earned prior to the date of termination as provided for in this Agreement computed pro rata up to and including that date of remuneration."

have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/ ROBERT C. MITCHELL<br>United States Magistrate Judge

Dated: January 20, 2006